Good morning, may it please the court. My name is David Schlesinger. I represent the appellant, Dr. Lewis Donald Guess, who is free on bond pending appeal and is present in court today. There are three principal reasons why this court should reverse Dr. Guess's conviction on two counts of violating 26 U.S.C. 72061. First, objective evidence in the record illustrates that Dr. Guess actually donated 33,000 shares of Perennial Funding System's common stock to the Zaland Foundation by the end of calendar year 2001, therefore illustrating that the donation was not false, and necessarily, even when construing the evidence in the light and the spirit of God. What happened to the proceeds from the stock? Well, are you referring to the profits, your honor?  We believe, your honor, that the government had to prove beyond a reasonable doubt that the Zaland Foundation was actually entitled to profits, distributions in some ways, such as a dividend. Yeah, but where did they go? I'm not suggesting that they should have gone A, B, C, or D, but they did go somewhere, and I'm asking you, where did they go? Certainly, your honor. The profits went to officers of the corporation who were entitled to profits. And who were they? Well, the evidence of record indicates, in addition to Dr. Guess, who was in charge of Perennial. Did they go to Dr. Guess? Some of them did, your honor, but not all. The evidence indicates that, for example, Paul Dunn, who was president of Zaland Investment Services, was entitled to profit sharing. John Farrington, one of the CPAs involved in this matter, also testified that there were profit sharing agreements. Now, where did they go? They could be traced, couldn't they? So we're not talking about the testimony, we're talking about where does the record show the profits went? The profits were most likely documented, your honor, in Perennial's various tax returns. On this record, didn't they go to Dr. Guess? Some of them did, your honor, but not all of them. We acknowledge that Dr. Guess did receive a fair share of the profits, but... After having given it away, didn't he? He did, your honor, but again, the government had the burden of proof of showing that the foundation, Zaland Foundation, was entitled to receive some of the distributions. In an ordinary situation involving a corporation, there's no requirement that I'm aware of under California law, Delaware law, or any other state's law that says that a common shareholder of a corporation's stock is entitled to receive profits commensurate to the percentage of ownership of the stock. So, and what also is... There were dividends on each share. So the question is, where did the dividends go on the shares that were supposedly contributed? That's the question. There's a... The record shows they went to Dr. Guess. They did go to Dr. Guess via compensation and as profits. There's nothing in the articles in Corporation and... If the stock had been given away, they would have gone to the recipient. They didn't go to the recipient. They went to the donor. So how could it be a gift? Well, let me also point out, your honor, that the... How could it be a gift? It was a gift, your honor, because the shares had independent value. There's... Shares carry dividends. Dividends go to the owner of shares. If Zalon Foundation was the owner of shares, the foundation would have received the dividends. If the donor received the dividends, that's compelling evidence that there was no gift. I think that the government saw the burden of proof, your honor. Compelling evidence. That's a pretty good burden. Again, your honor, just before I transition to another topic, I think it's worth noting that the government had to prove that something in the record showed that the foundation was entitled to receive dividends. There's nothing in the articles in Corporation for pyramidal or its bylaws saying that... There's no evidence in the records until much later of the contribution, is there? How about the evidence in the records of Zalon Foundation? You'd have two records if there was a contribution. You would have a record of the stock held by the donor, and you'd have a record of the stock received by the donee. And the donee has no contemporaneous record to show that it received stock. Actually, there is some contemporaneous record, your honor, to show that... You say much later? Well, it's seven months later. Well, it shows up in the audited financials for the Zalon Foundation, which were prepared on October 11, 2002, by Mr. Farrington. Ten months later. But it illustrates that because it then related to the foundation's tax return, which was filed the following month, it illustrates that the foundation received the stock at the end of calendar year 2001. Dr. Guess took a contribution, a large deduction for a contribution in 2001. He claims to have given the stock December 31, 2001, last day of the year. When was the first time that there was a record in Zalon Foundation of it having received stock from Dr. Guess? The first record, your honor, is the audited financials that Mr. Farrington prepared. And it's the first definitive record. That's a secondary record. But there are also... Audited financials are opinions of what the books and records show. What do the books and records show? The evidence of the record is that the first evidence of it is in July of 2002. And the custodian of the record had no knowledge of it, having been posted any earlier than that.  I'm not sure that copies of the stock certificates were in Dr. Guess's foundation files. Let me, if there are no further questions on this topic, let me turn to the Sixth Amendment issue involving Mr. Jacot and the district court's categorical preclusion of his testimony. Well-established case law from this court illustrates that to preclude a witness from testifying entirely because he was going to invoke his Fifth Amendment privilege in response to a limited series of questions that the government was going to pose on cross-examination, there has to essentially be a preclusion altogether of the government's ability to cross-examine the witness. It has to completely take away the government's ability to do anything amounting to an effective cross-examination. And the record in this record, do we know whether it was total or less than total? Well, we know, Your Honor, based on the colloquy with the district court, which appears in the first volume of the excerpts of record, and based on the proffers that both Dr. Guess's trial counsel and- The record shows that he was going to assert on cross-examination on his Fifth Amendment privilege regarding only a very limited subset of the questions that the government was going to ask him. It had nothing to do with his being a general counsel and having been paid substantial amounts from Dr. Guess. So all we would have is direct examination and no cross on the critical points of Mr. Jacot's job. Well, he was going to be cross-examining on everything except, Your Honor, if you look at B1 through B8, the nature of the compensation that he received in 2001 and 2002 and whether he reported those on his corporate tax returns. On direct, he was prepared to answer every single question that was proffered by Dr. Guess's trial counsel, Mr. Rubin.  what he was going to testify to on direct. He was going to testify to one thing, and the questions on cross were going to go to his truthfulness as to his own tax situation. And this is maybe complicated, maybe simplified by the fact that we're actually dealing with a fairly sophisticated judge who's both ruling on the admissibility of the testimony and serving as the fact finder, so we're not dealing with what the jury would or would not have heard. But the cross was going to show, at least potentially would have shown, that he was a tax cheat. And I think if you've got somebody testifying in favor of Dr. Guess saying that Dr. Guess is not a tax cheat, and he's not required to answer questions on cross that show that he himself, the testifying witness, is a tax cheat, that goes pretty close to the nature and credibility of the testimony in favor of Dr. Guess. I think, Your Honor, also the district judge didn't fully appreciate that the evidence that the government wanted to use in cross-examining on questions B1 through B8 would have violated Rule 608B of the Federal Rules of Evidence because the government, Ms. Devine, was going to use extrinsic evidence to try to show his propensity for truthfulness or lack of truthfulness. And I should also note, Your Honor, that regarding the propensity for truthfulness, Mr. Jacot had already conceded that he was willing to answer questions about whether he was faking his inability to speak and regarding the circumstances that led to his speech condition. So there was ample opportunity for the government to be able to cross-examine regarding truthfulness. He had conceded the bias on a broad swath of topics, including his personal animus toward Ms. Devine and his belief that the government was engaged in vexatious prosecutions in this area. So simply because he didn't want to answer questions about his own tax returns doesn't mean that he wasn't willing to be cross-examined. And he was willing to answer... More than he didn't want to answer the questions, he was saying the answer to that question will tend to incriminate me, so I won't answer it. He was going to, as the language says, take the fin. Was he? For B-1 through B-8, Your Honor, yes. You said he didn't want to testify. He was going to refuse to testify. For those questions, Your Honor, but when you look at Denim v. Deeds, Your Honor, and United States v. Lord, those cases say that Lord especially says that it's an extreme sanction to preclude a witness from testifying altogether simply because he is unwilling to answer questions about... or he wants to invoke his Fifth Amendment privilege regarding a certain topic. Our view is that in the light of the combined proffers, that this was, if not a collateral issue, his refusal to answer questions regarding the tax returns, at the very least it was either cumulative and therefore not proper under Rule 403, or given how Ms. Devine was playing on cross-examining him, was violative of Rule 608B because she was going to use extrinsic evidence, namely checks that he had supposedly deposited in his various bank accounts. If there are no further questions at this time, I'd like to reserve the remainder of my time to follow up. Actually, I do have one question. Certainly, Your Honor. We'll make sure that you have enough time to respond, even if we take you up to your time. Thank you very much, Your Honor. Assume for the purposes of this question that the testimony of Mr. Jaco was wrongfully excluded. What's the harm? I mean, that's the next question. What would he have testified to, and why is that harmful to Mr. Guess's case, and to what degree is it harmful? Certainly, Your Honor. Well, he was the general counsel of the Zillon entities, including the foundation, and as Mr. Ruttman and Dr. Guess's trial counsel proffered, Mr. Jaco was going to testify regarding Dr. Guess and Mr. Jaco having signed the pyramidal stock certificates at the end of December 31, 2001, and then transfer them to the custodian whom Judge Hellerstein referenced, Ms. Ruiz. Therefore, under the pyramidal bylaws, that was all that was necessary to effectively transfer the stock to Zillon Foundation, and if a finder of fact were deemed Mr. Jaco credible, then Dr. Guess would have been acquitted because the donation would have been deemed a truthful, actual donation. Despite the fact that the proceeds of the stock or dividends go to him even after the ostensible donation? Well, I think, Your Honor, that Mr. Jaco would have testified regarding the profit distributions for the stock and whether the foundation was actually entitled to the profits or whether the stock had an independent value. If you're going to take a deduction for giving stock at the value of the stock, the value of the stock includes the right to receive dividends. Now, the donation that he claimed gives actually no indication that he's giving the stock but continues to retain the right to receive dividends. So even if the deal had been, you get the stock, I get the dividends, and maybe one of these days I'll let you have the dividends or let you sell the stock, but the deal now is you get the stock and I get the money, that's not recorded anywhere. And the normal consequence of a gift of stock is you just give the stock and the right to the dividends that goes along with the stock. Again, Your Honor, I guess I'm circling back to an earlier point, and we might end up having to agree to disagree, but I don't think that the government demonstrated in any way or that there's any evidence in the record indicating that the foundation or any holder of the stock was entitled to a dividend. And just before I conclude, if I could just briefly wrap up, Mr. Jacot would have testified regarding various efforts to sell the corporation, which would have netted a considerable amount of money for the foundation if the stock had been sold because it was a third of the corporation's holdings. It's all hypothetical. I don't see any question that would have elicited the comment that you said it would, that Dr. or that Mr. Jacot delivered the stock. I mean, there was no question that he would have grunted an answer yes to that supports what you said. I think when you look at the direct examination questions. You're looking at 102 and 103. Yeah, I'm looking at 102 and 103. 103, for example. 12B, did you witness Dr. Guess sign? Do you know why he signed this stock certificate? Did you tell him to sign it? Why? When date did he sign? 13, were shares transferred in other companies? That goes to the general plan they had originally been talking about. No question having to do with delivery. To make a gift, you've got to deliver. I think it's fair to say, Your Honor, that given the nature of the testimony in the case, there would have been questions regarding the delivery of the stock. A certain number of grunts, I guess, would have told you that. Thank you. Thank you. If there are no further questions. Let's hear from the government, but we will give you a chance to respond. Thank you very much, Your Honor. Good morning, Your Honors. My name is Faith Devine, and I'm appearing on behalf of the United States. And, Your Honors, in this case, U.S. District Court Jeffrey Miller carefully considered the evidence in this case, and the record is clear beyond reasonable doubt that the appellant, Donald Gass, falsified his tax returns when he claimed that he donated $800,000 in stock in his closely held company pyramidal funding system to his charity that he controlled. And I note that Your Honors have discussed the profits as being one of the pieces of evidence that the district court found and supported his decision that the appellant was guilty, but there's a lot of other evidence in this case, too. And the fact that somebody may have witnessed a stock certificate being signed on December 31st, 2001, is really irrelevant because there is a lot of other evidence, and I think that we have really outlined that in our brief, and I don't want to reiterate what we have in our brief, but one of the factors is that this donation was never booked in the actual records of the Zalon Foundation. And Wendy Ruiz, who was the administrator of the foundation and worked for the appellant, Dr. Gass, she testified that it was never booked because he never told her about this gift. And there was documents that were presented at trial, which she testified about, which showed all of the donations that are made by all the donors, and Dr. Gass's donation was never on those records. It didn't appear until there was this tax return that needed to be filed in October of 2002, and that's when it showed up on an audit report by the company's accountant, but it never was in the actual books and records of the Zalon Foundation, and that was a lot of the evidence. Another factor was that Dr. Gass himself actually submitted a document under penalty of perjury in March of 2002 in which he told the IRS that he had only donated $12,000 to the foundation. So that is evidence of his donative intent, because if he had donated this stock worth $800,000 in December 2001, why did he tell the IRS in March of 2002 that he only donated $12,000? There was a lot of other evidence. There was the president of the company, Parametal Funding, who was Dr. Gass's son, and he testified that he had absolutely no idea what this transaction was about, and here he was, the president, or supposedly the president of this company, had no idea what this transaction was about, and he didn't even know if that was his signature. You know what is somewhat unusual? The government appears to have been emotionally involved, personally involved. If somebody's, the record is there, and the court's going to decide based on the record, but was there personal animosity between the government and Dr. Gass? No, Your Honor. I mean, obviously a prosecutor has to do their job. Yeah, they do, but they don't have to be mad about it. Do I appear mad? I'm sorry. No, not now. Not now, but when we look at the record, it appears that there was less than the prosecutor doing her job, and I'm not suggesting that that's the reason, but if a person gets a feeling that there's something personal, then the person may decide, I'm going to hide my hand a little more than I would ordinarily. Do you understand what I'm talking to you about? I understand that, Your Honor. Do you think it's a reasonable human reaction? I guess I... Not mine. Mine doesn't matter. When we look at this record, and we have to, don't you think? And I guess, I hope you both can gather that we must have, we see that little sharpness that I don't think had any business in this record. Now, maybe I'm seeing something that isn't there. I, you know, with all due respect, Your Honor, I think you might be seeing something that's not there, because, you know, other than being an advocate for the government, I mean, I don't see where the personal animosity shows in the record, and... All right. I could be mistaken. It's been known to happen in the past. I mean, if anything, I think that the animosity might have been from the other side, in that, you know, the appellant in this case may have had a longstanding history with the IRS and had been upset with the IRS, but the government came in, or at least I personally came into it many years after that, and I don't think... I know that one of the defendants, Mr. Jacot, one of the other persons involved in the case, I mean, I know that he had a personal animosity, and that is part of the record, too, in that, you know, he would... he had a website, a vindictive prosecution website, and I think that's in the record, but, I mean, I think the animosity is really on the other side, and, you know, we're just trying to do our job and pursue the case. No, no, no. Go ahead with your argument. Don't worry. You're not being accused. I'm questioning rather than accusing. Yes, sometimes, you know, when you read something in the record, and then you meet the person, and it may not, you know, sometimes what you read may not exactly be what's the truth, so... I'm familiar with that, yes. Thank you. So, anyways, back to my point, is that, you know, there was a lot of evidence that supported the district court's decision that the defendant was guilty, and it wasn't just one thing or the profits, and I go back to the profits, because one of the things that I think you asked is that, you know, what was... who was entitled to these profits, and one... what happened was the company accountant, John Farrington, he actually testified that that was the practice of the companies, was to pass the profits to the owners and to the other executives, and that at the end of the year, you would zero out the profits. And so what the evidence was in this case is that in the year that the appellant, Dr. Guest, claimed that he had donated this stock, he received $2.7 million. And, of course, some of the other executives of the company also received that money, some money, not $2.7 million, and I think what's even more important here is that questions on cross-examination about, you know, the circumstances surrounding those profits, so I think that was very key in the heart of the case. And when U.S. District Court Judge Miller struck his testimony, I think it was completely appropriate, given the fact that he was going to assert the fifth on what would have been the heart of the matter and really what was, like, very, very important to this case. And I think the record is very, very clear that Judge Miller was very methodical about making this decision. It wasn't forced on any of the parties, and I think the parties ultimately agreed that, you know, they would submit to this procedure where they would provide their questions. What's our standard in reviewing that ruling, abuse of discretion? Yes, Your Honor. So we would have to find, in order to reverse, that Judge Miller abused his discretion in deciding that Mr. Jacob could not testify? Correct. And as to the determination of the facts, what is that standard? Absence of sufficiency of evidence, given all inferences in favor of the government? Exactly, and in that, you would have to, you can't substitute your credibility determinations for that of the district court. Well, there were no credibility determinations, except for the different witnesses, right? I'm sorry. Correct. I mean, he found that Wendy Ruiz was very credible, that, you know, she had good record keeping, and I think that goes to, you know, support some of his findings that, you know, if she was so good at the record keeping, then why is it that this one transaction? The major determination was that there was willfulness on the part of Dr. Guess, that he didn't just subscribe by mistake. He subscribed knowing that there was a material error, a misleading statement in his tax return. Correct. And that is supported by an absence of evidence in the record to support that finding. Well, that, his knowledge and willfulness is supported by, well, first of all, as I just discussed, Dr. Guess himself submitted under penalty of perjury to the IRS in March of 2002 that he only donated $12,000. So it's a contradiction. Correct. A material contradiction. Correct. And then there's also evidence in the record of his communications with the- He would think that by March, three months after the event, he would not simply have forgotten that he had contributed stock if, indeed, he had contributed stock. Correct. So by making that mistake, we infer, or the district judge inferred, that it was an intentional error. Correct. And there's additional evidence also. It's pretty stupid on the part of Dr. Guess, first to put in a tax return claiming a $700,000 deduction, and then three months later, simply to forget. It's strange, isn't it? Actually, it's before. March of 2002, he submitted- A declaration that did not recognize that supposedly three months earlier he had made a $700,000 contribution. Correct. And then six months after, in October of 2002, he submitted the tax returns that are the subject of this case, in which he falsely stated that he donated $800,000 worth of stock. So that's one piece of evidence. There's also evidence the pyramidal tax returns that were filed still declared under penalty of perjury that he still owned 100% of the stock. And when were those filed? Well, Craig Boros, the accountant, testified that he filed the first return, the 2002 return, in September of 2002, which is a month before the October filing, in this case, of the tax return, which falsely stated that he had donated. Did Dr. Guess sign the tax return for Pyramidal? No. That was done by his accountant, but he was in control of these companies, and the accountant testified that he was not told or he was not aware of the transfer or the fact that Dr. Guess no longer owned 100% of the company. And so when he filed the returns on September 2002. And then in addition to that, there's also the testimony of Paul Dunn, who was the president of Zalon Inc., one of the other, or Zalon Investment Services, which is one of the other related entities. And they're required every year to file their SEC disclosure forms, and those forms were very important that they have to be truthful to the SEC and they have to disclose the ownership and control. And so there was forms that were filed, and Mr. Dunn testified that he signed the forms, but he was under the understanding that Dr. Guess was the 100% owner of Pyramidal, and those forms were in the record, and they showed that Dr. Guess owned 100% of Pyramidal funding. And then there was also the whole circumstances of how the form, which is really the false statement in this case, the 8282. I'm sorry, I always get these forms mixed up. The 8283 form that's attached to the tax return, which identifies that he donated the stock and it's signed by the charity, that's the form. There was all these circumstances surrounding. Tell me more about that form. Well, first of all, it's false because it says. Signed it. Well, there's two people, or actually three people that actually have their handwriting on it. There's Carl Flatley, who was one of the nominal directors of the foundation, and he said he signed it, but then he said that this is not his normal functions as the director of the Zalon Foundation. He wasn't even in San Diego on the day that the form says that it was signed, and he knows nothing about the gift. And he testified that he would have signed anything if Dr. Guess had put it in front of him because he trusted Dr. Guess. And the testimony at trial was that he actually was in town on October 15, 2002, for a board meeting. So when you look at all the circumstances and that that actual form was faxed to the accountant on October 15, 2002, in order to meet the filing deadline, and she, Judith Hamilton, Dr. Guess's accountant, actually testified that she filled in certain information because they needed to get it filed with the IRS, so she filled in the date, December 31, 2001. And so I think the inference that can be drawn from all of that is that Dr. Flatley lives in Florida, but he happened to be in town on October 15. That's when he was asked to sign the form, and the accountant filled in the date without regard to when this ever happened. And then on top of that, there was an $800,000 appraisal figure in that form, and John Farrington signs the form also, and he testified that he didn't put the $800,000 number in there. Somebody else put it. He signed the form, but he admits he didn't sign it on December 31, 2001, and it says December 31, 2001. So there's all these circumstances. How do you attribute all of this to Dr. Guess? Well, because he's the one that communicates with the accountant, and we produced a trial, there's billing records showing that Dr. Guess had phone conversations all the way up until October 15, 2002 with Judith Hamilton about the contribution, and in fact there's testimony that on October 11, 2002, there's notes that say that, well, we're going to use $2 million. So it hadn't even been determined what the actual figure was, and the accountant testified that that wasn't his figure. And so you attribute that to Dr. Guess because you look at the billing records and also the testimony of his personal accountant, which shows that they had these communications surrounding, you know, on the circumstances of leading up to the date that the tax returns are filed, and of course he files the tax returns. He signs it under penalty of perjury. So your argument is that there was ample evidence in the record to support the district judge's finding? Correct. Okay. We've taken you over time. Thank you. Sorry about that. No problem. And Mr. Schlesinger, we took you up to time, but would you like two minutes to respond? I would, Your Honor. Thank you very much. Let me make a couple of quick points regarding the sufficiency argument. Ms. Devine referenced Dr. Guess as having donated $12,000 in cash to the foundation in 2001. What's notable is that he did not actually declare that donation on his 2001 return, again illustrating that there was sloppiness, there were mistakes made throughout this process, but if Dr. Guess didn't even declare that $12,000 donation that Ms. Devine referenced, then it illustrates just kind of that haphazard sloppiness that was pervading the process, but there isn't any evidence regarding Dr. Guess's actual cyanide to willfully file false tax returns. There was some discussion of the Praml returns. Dr. Guess did not actually sign those returns. I actually just checked the record. There are other officers in the corporation who signed those Praml returns. I think that's consistent with what Ms. Devine just said. Yes, I just wanted to make sure. There's another key piece of evidence in the record, 2004, Chapter 11, filing by Praml, illustrating that the Zalon Foundation owned 33,000 shares of the stock, again evidence showing that the transfer actually did occur and that the corporation itself had recognized that it had transferred the stock. Let me get back quickly to the Jakob Sixth Amendment issue. Let me address the question that Judge Heldersman had asked about whether Mr. Jakob was going to be asked about the transfer of the paperwork. I think question 13, where shares transferred in other companies, also presumes that he was going to be asked about the circumstances regarding the transfer of shares to Ms. Ruiz on December 31, 2001. Again, quickly before I wrap up, let me refer you to ER-101-3D. He was going to be queried quite extensively about his payment structure and whether he received salary and bonuses from the profits of the Zalon entities. There was clearly going to be some questioning about Mr. Jakob's compensation. It's simply that he wanted to invoke the Fifth regarding how he declared that compensation in 2001 and 2002. There was no question that he was being compensated. If there aren't any further questions, I'd be prepared to submit. Okay, thank both sides for good arguments. United States v. Guess, submitted for decision. Thank you very much. The next case on the argument calendar this morning, Segundo Suenos v. Jones.
judges: Hellerstein, Farris, Fletcher